**In re EVANS.**

**WIENTGE et al. v. MARINE TRUST CO.
OF BUFFALO et al.**

No. 396.

Circuit Court of Appeals, Second Circuit.

July 23, 1936.

Parker, Finley & Benjamin, of New York City, and Donovan & Raichle and J. C. Randal, all of Buffalo, N. Y. (Frank G. Raichle and Jules C. Randal, both of Buffalo, N. Y., of counsel), for appellants.

Kenefick, Cooke, Mitchell, Bass & Letchworth and William R. Emblidge, all of Buffalo, N. Y., for certain unsecured creditors.

Franchot & Warren, of Buffalo, N. Y. (William C. Warren, Jr., of Buffalo, N. Y., of counsel), for bankrupt.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal by leave of this court from an order which dismissed the petition of two attaching creditors of the bankrupt, to vacate an adjudication entered upon his voluntary petition; the bankrupt and some of. his unsecured creditors resist. The only question of law involved is whether there is any evidence substantial enough to support the judge's finding that on April 20, 1934, when the bankrupt filed his petition, he had had his principal place of business in Buffalo for the greater part of the preceding six months. In his petition for adjudication verified January 31, 1934, the bankrupt swore that he then resided in Carmel, Cal., but that for the greater part of the preceding six months his principal place of business had been Buffalo. Until 1929 he had been connected with a Buffalo trust company as a salesman in its bond department, and he then became a partner in a firm of stockbrokers, which was dissolved in the autumn of 1931. He left Buffalo, and since that time has wandered pretty continuously, without occupation, except writing one novel which brought him in very little money, and another that has not been published. He has been supported either by remittances from his mother, or by his inheritances. He first went to New Mexico and in 1933 to Nevada, where he got a divorce. He at once married again and has since then lived for the most part in New Mexico. Since leaving Buffalo he has been back only twice.

While engaged in business in 1929 he became one of a syndicate of five speculators in shares of stock, who to finance their operations borrowed from the trust company with which he had been connected. Three of these left this syndicate in June, 1931, but the other two continued and the bankrupt became the manager. As such he had repeatedly to execute renewal notes by one Warren, his attorney in fact. The syndicate had not been closed up before the petition was filed and was not insolvent; but as he was unable to pay his share of the carrying charges, the four others had to advance them, so that before the petition was filed his interest had been exhausted. He had taken out a policy for $100,000 on his life pledged as security for the syndicate obligations; on this he was also unable to meet the premiums, which had to be advanced by others and charged against him. (He also had some unpledged policies on which he defaulted, and various

expedients were necessary to get some salvage out of these.) This syndicate was a substantial affair of about $200,000 involving considerable supervision conducted in the bankrupt's name. There was a second and much smaller one, of which he was not the manager and which was wound up in February, 1934; it, too, was managed in Buffalo. He also had some interest in real estate in that city, which was closed out at a time not fixed. He always had a bank account in Buffalo. All these affairs of one sort or another required so much attention that his attorney in fact, in whose hands he left everything, had to communicate with him almost every day by letter, wire, or the like. All his notes, including those of the objecting creditors in this proceeding, were payable in Buffalo; and of his other creditors amounting to more than $200,000 practically all live in that city. The special master and the judge found on this evidence that his principal place of business was Buffalo.

The Bankruptcy Act, § 2 (1), 11 U.S. C.A. § 11 (1), fixed the venue of bankruptcy proceedings in the alternative; they should be brought either where the bankrupt resided or had his domicile, or where he had his principal place of business. We pass the question whether there is a difference between residence and domicile in this connection, for it is clear that these were taken more or less as one, and that ordinarily a man's domicile will be the convenient place for liquidating his affairs. The alternative assumed, however, that it might not be, because most of his creditors would often be found where the bankrupt's principal business went on. In the case at bar, so long as Evans was in any active business at all, Buffalo was its place; and when he withdrew, two years before the period which counts here, much still remained to be done which somebody had to take charge of. This need extended over those two years. It is no answer to say that all but a theoretical interest in both syndicates had been exhausted and that the management of the larger one had become nominal. Evans was the maker of the notes; he had to renew them; they were his obligations. When his fellows advanced the money to meet the carrying charges and took from him evidence of his indebtedness, it was all business which he had to transact, or some one for him, and it made not the least difference that he had lost all practical chance of profit from it. The parties chose that form for their affairs;

and not as a sham, for they meant to create exactly those obligations which followed from its use. There was therefore a real business to be wound up, and Buffalo was the only place where that could be done.

In such a situation the place of winding up is the principal place of business, while any genuine winding up remains. We decided in the case of a corporation that the bankrupt need not be engaged in a going business, if it had any activity at all. In re Guanacevi Tunnel Co. (C.C.A.) 201 F. 316. In Royal Indemnity Co. v. American Bond & M. Co., 289 U.S. 165, at page 169, 53 S.Ct. 551, 77 L.Ed. 1100, the court expressly declared that while winding up continued, the principal place of business was where the business had been carried on. In Re American & British Corporation, 300 F. 839 (D.C.Conn.), the receiver was engaged in winding up. It does not appear in Re Moench & Sons, 130 F. 685 (C.C.A. 2), that the receivers continued the business, and the question was not apparently regarded as important. In Tiffany v. La Plume Condensed Milk Co., (D.C.) 141 F. 444, the business had been closed out; the opinion is interesting in its discussion of those English cases which held that though the bankrupt had changed his occupation to an exempt one he could be treated as a "trader," qua debts incurred while in trade. It must be owned that In re Little, Fed. Cas.No.8,391, 3 Ben. 25, appears to be contra, but two things are to be observed: First, the petition was false, a matter on which the judge commented; and, second, the act of 1867 (14 Stat. 517) uses the words "carried on business," which are more limited than those of the present act. Whether a man is "carrying on business," when he is winding it up, is more doubtful then whether he has a "place of business" while so engaged.

We cannot have any doubt on principle that the statute ought to cover such a situation; the whole question is one of convenience, and winding up is as much part of the business as building a plant or preparing offices. The considerations, which make desirable a concourse of creditors at the place where the business went on during its life, continue while it is being dismembered and disposed of. Indeed, bankruptcy is itself a form of winding up, so that it would ordinarily break in upon the conclusion of what was going on to wrench it from its seat and finish it elsewhere. The case at bar is a good illustration; by far the greater amount and number of

creditors are in Buffalo; it is indeed extremely doubtful whether the proceedings could be laid anywhere else. We should have to be well persuaded that the bankrupt ever got a real domicile in Reno, or that his home was in Carmel or in Taos in 1934; perhaps his domicile never had changed at all. Anyway, he had never struck root but in Buffalo, which was by every reasonable measure the place to liquidate his affairs. It was there that his past activities had created nearly all his debts; it was there that the remains of his business must finally be buried; it was there that every financial activity of his life had taken place; even the remittance to him of the income upon which he lived came from an estate administered in the Western District of New York.

Cases like In re Lipphart (D.C.) 201 F. 103, and In re Price (D.C.) 231 F. 1001, are quite different; they proceed on the theory that clerks and salesmen should not be regarded as having any place of business at all. Whether they are right we need not say; the bankrupt at bar certainly did once have a place of business, and the only possible question is whether it continued during the greater part of six months preceding April 20, 1934.

Order affirmed.